UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

98 AUG 12 PM 3: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ALTON R. SIMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil Action No. CV-96-S-3064-NE |
| | ) |
| SUPERIOR METAL PRODUCTS, INC., | ) |
| d/b/a CULLMAN PRODUCTS; | ) |
| CULLMAN PRODUCTS | ) |
| CORPORATION and AMERICAN | ) |
| TRIM, L.L.C., d/b/a CULLMAN | ) |
| PRODUCTS, | ) |
| | ) |
| Defendants. | ) |

**ENTERED**

AUG 1 2 1998

## MEMORANDUM OPINION

Plaintiff, Alton R. Simpson, began his employment with Cullman Products Corporation ("Cullman Products") during September of 1971. (Simpson Deposition at 88-89, 181.) Cullman Products fabricates metal trim, frames, and handles for home appliances and other products at its Cullman Alabama, manufacturing facility. The company merged into Superior Metal Products, Inc., an Ohio corporation, on January 21, 1996. American Trim, a Delaware limited liability company, thereafter purchased the assets of Cullman Products and Superior Metal, and assumed control of the company on January 22, 1997. Throughout those ownership changes, the Cullman facility where plaintiff works continued operating under the same name, with the same employees and on-site management, fabricating essentially the same products. (Plaintiff's Exhibit C, "Kadela Letter".)

97

Simpson worked as a machine operator, primarily in the paint department, until early 1995. (Simpson Deposition at 89-90, 184.) At that time, Cullman Products implemented a new organizational structure, classifying each department in the plant as a "business unit." (*Id.* at 79-80.) Simpson was assigned to "Business Unit 1," which consisted of the former paint and anodize departments, in January of 1995. He continued to work as a machine operator under the direction of one or more supervisors. (*Id.* at 222-23.) Thereafter, "Business Unit 2," which consisted of the frame area, was merged into "Business Unit 1." The combined units functioned under the designation "Business Unit 1," and Simpson continued to work as a machine operator within that unit.

Simpson took a leave of absence on July 19, 1995, to have his swollen and painful right foot examined and treated by a physician. (*Id.* at 283, 305.) Dr. Sorenson, an orthopedic surgeon in Cullman, diagnosed Simpson's condition as reflex sympathetic dystrophy ("RSD"). (*Id.* at 284, 288-89.) A series of examinations by approximately ten other physicians followed, and Simpson ultimately was referred to Dr. Michael Hammer, a Birmingham anesthesiologist and pain specialist, who confirmed the diagnosis of RSD.[1] (Hammer Deposition at 127.)

Simpson remained on leave until November 16, 1995. (Simpson Deposition at 283-84.) During that time, the pain in his foot worsened and migrated upward, into his right leg. (*Id.* at 305.)

---

[1] Dr. Hammer testified that RSD is an archaic term, however. The proper terminology for plaintiff's condition apparently is Complex Regional Pain Disorder Type 1 ("CRPD 1"). (Hammer Deposition at 27.)

2

He was unable to wear a sock, because his foot was so sensitive to touch. (*Id.* at 299-300.)

Dr. Hammer ultimately released Simpson to return to work on November 16, 1995, but with certain restrictions: Simpson was not to lift more than 20 pounds, and he was to avoid prolonged sitting and standing. (*Id.* at 401; Simpson Volume Five at 41.)[2]  Dr. Hammer also orally instructed Simpson that he should sit or stand as needed to ease his pain, and that he should occasionally elevate his foot. (Simpson Volume Five at 16-17, 41-42.)

Prior to his return to work, Simpson delivered Dr. Hammer's written authorization to Evelyn Dahlke, Cullman Products' personnel director, and Pete Sims, the company's human resources manager. (Simpson Deposition at 405; Simpson Volume Five at 41.) Dahlke and Sims told Simpson he did not need to see the company's physician, Dr. Henry Beeler, before returning to work. Neither Dahlke nor Sims questioned Simpson about his medical restrictions at that time. (Simpson Deposition at 409.)

Simpson returned to work his assigned shift on November 16, 1995. (*Id.* at 410.) Ronald Shoemaker and Carl Lewis, Simpson's supervisors in Business Unit 1, assigned him to operate a press in the anodize area that day. (*Id.* at 411, 413.) He performed that task for the entire day. (Simpson Volume Five at 8.)

During the course of Simpson's first day back on the job, Lewis told him he needed to see Dr. Beeler about his medical

---

[2] Simpson's deposition consists of five volumes. Volumes one through four are sequentially numbered. Volume five, however, is separately paginated. Accordingly, that volume of his deposition is cited as "Simpson Volume Five."

3

restrictions.  (Simpson Deposition at 413.)  Pete Sims then told
Simpson he wanted him to see Dr. Beeler about "getting rid of his
restrictions," and directed him to obtain a document from another
physician so the company could "get rid of those restrictions."
(*Id.* at 413-15, 417, 435.)  Sims also warned Simpson "there was
nothing that [he] could do about it" if the company "didn't follow
[his] restrictions," except "either go back to work or just walk
out of the plant."  (*Id.* at 418.)

     Sims ultimately instructed Simpson that he had to see Dr.
Beeler that day (November 16), or he would not be allowed to return
to work the following day.  (*Id.* at 419.)  Accordingly, immediately
after work Simpson drove to Dr. Beeler's office.  After examining
Simpson, Dr. Beeler imposed the following restrictions:  Simpson
should not stand or walk for long periods of time, he should not
climb, and he should not lift more than 20-25 pounds.  (Dahlke
Deposition, Plaintiff's Exhibit 3.)

     Simpson delivered Dr. Beeler's report to Shoemaker and Lewis
the following morning.  They would not allow Simpson to clock in,
and sent him home.  (*Id.* at 420.)  (Simpson contends, however, that
he was contacted later that day by both Sims and Jonas Chrietzberg,
Cullman Products' superintendent of production, each of whom
allegedly instructed him to return to work for "just a few
minutes."  (*Id.* at 424-25, 429; Simpson Volume Five at 8-9.)  No
explanation for that unusual request is contained in the record.)

     Simpson reported to work the next day, November 18, 1995, and
reminded Lewis and Shoemaker that he could not stand for an

4

extended period of time, and that he needed to be able to sit or stand as needed. (Simpson Deposition at 432.) Sims asked Simpson "how long the restrictions will last" on at least two occasions that day. (Id. at 433.) Sims, and on one occasion, Lewis, also allegedly asked Simpson to sign a document which he was not allowed to read. Simpson refused. (Id. at 440.) The same request was made repeatedly thereafter by Sims and others, often framed as an ultimatum: either get rid of the restrictions or sign the document, unread. (Id. at 418, 438, 444-46, 453, 459, 483-84.)

Simpson was assigned to work in the frame area under the supervision of Theron Robertson on or about December 5, 1996. Upon reporting to work, Simpson informed Robertson of his restrictions. Robertson allegedly responded: "when you come to work there [are] no restrictions" and "you do what I tell you to do." (Simpson Volume Five at 42-43, 86.) Robertson then assigned Simpson to a job which required him to stand for extended periods of time, to strain to hold a part while running the press, and to pull and stack heavy skids. (Id. at 43, 79-86.) Performance of those duties caused Simpson severe pain. (Id. at 89-90, 92.)

Simpson told Robertson he was hurting and asked to sit down, but Robertson again replied: "you run what I tell you to." (Id. at 86, 88.) Simpson's request to speak to Chrietzberg or Shoemaker also was denied. (Id. at 43, 88.) After completing his shift, Simpson informed Shoemaker that he had problems performing the job assigned to him by Robertson. (Id. at 93, 97.) Shoemaker told

5

Simpson that he should let him know if he had difficulty performing any assigned task.  (*Id.* at 44-45.)

Simpson nevertheless contends he was assigned other jobs that exceeded his restrictions and caused him severe pain throughout the two month period following his return to work.  (Simpson Volume Five at 43-44, 73, 102.)  In particular, Simpson complained of racking parts, a job which demands extended standing, heavy lifting, and repeated bending.  (*Id.* at 75, 104-05, 106-08.) Simpson also complained of being assigned to "satin" parts, sand parts, and operate a press.  (*Id.* at 116, 120-22, 124-27.)  In response to his complaints, both Lewis and Shoemaker told Simpson there were no available jobs that could be performed in a seated position.  (*Id.* at 75, 107, 109-10.)  Despite numerous complaints to Lewis, Shoemaker, and Chrietzberg, Simpson contends he repeatedly was assigned to jobs which violated his medical restrictions.  (*Id.* at 110-12.)

Simpson again was assigned to rack parts on the morning of January 22, 1996.  (*Id.* at 132).  While performing that assignment, Simpson passed out and was transported by ambulance to the hospital.  (*Id.* at 132, 134.)

Simpson returned to Cullman Products a few days later to discuss the possibility of filing a workers' compensation claim based upon the incident on January 22nd.  He met with Dahlke, Sims, and John Tucker, the company's safety coordinator.  (Simpson Deposition at 472-74.)  Dahlke and Sims purportedly discouraged

6

Simpson from filing such a claim, and attempted to have him sign various documents (which, again, they would not allow him to read). (*Id.* at 476-78, 489-90.) Sims allegedly told Simpson he was "becoming a liability" and should find "another job." (*Id.* at 477.) Dahlke instructed Simpson to undergo another examination by Dr. Beeler. (Simpson Volume Five at 140.)

Following that meeting, Simpson contends his attempts to return to work were thwarted until May 20, 1996. For example, Simpson was given a return to work authorization from Dr. Hammer stating he could resume working on March 18, 1996. Yet, he contends that Dahlke refused to accept the authorization and handed it back to him. (*Id.* at 144-47.)

Nevertheless, Simpson reported to work that day and gave Dr. Hammer's authorization to Lewis and Shoemaker. They did not allow Simpson to clock in, and told him to wait in the supervisors' office. After an extended period of time, Simpson attempted to locate Lewis, Shoemaker, Dahlke, or Sims, to determine whether he would be permitted to work. He was unsuccessful in locating a member of management and, thus, decided to return home. (*Id.* at 150-54.)

Simpson was contacted at home later that day by Dahlke, Sims, and Chrietzberg, each of whom apparently gave him conflicting instructions. Sims told him to return to work immediately for "just a few minutes," and Dahlke and Chrietzberg told him to report to work the next day under Dr. Beeler's restrictions. (*Id.* at 157-59.) Dahlke later phoned Simpson and told him he could not return

7

to work until Shoemaker returned. Although she promised to do so, Dahlke never contacted Simpson to report Shoemaker's presence at work. (*Id.* at 159-61.)

Following a series of failed attempts to meet personally with Dahlke to discuss his return to work, Simpson sent a letter to Shoemaker and George Pennington, Cullman Products' vice president of operations, on March 25, 1996, notifying them of his request to return to work and his intent to exercise his rights under the Americans with Disabilities Act. (Simpson Volume Five at 166-67.) Simpson met with Dahlke and Pennington in early April of 1996. During that meeting, they attempted to have Simpson write out his own restrictions, and they suggested that he needed to see a physical therapist to resolve conflicts about his restrictions. (Simpson Deposition at 528, 537.) Although he agreed to do so, such an examination apparently did not occur immediately. (*Id.* at 537-38.)

Simpson received a letter from Pennington dated April 16, 1996, which stated, in part:

> You are hereby ordered to return to work by April 30, 1996. Prior to your return to work, you will be required to undergo a "fitness for duty" medical examination as defined in the regulations to the Americans with Disabilities Act ("ADA"). The Company will pay for this examination with Dr. Beeler and a licensed physical therapist. You will be reinstated to a position which satisfies any restrictions established with this exam. Failure to report to work by April 30, 1996, will result in your termination.

(*Id.* at 549, Exhibit 8.)     Subsequently, Dr. Beeler examined Simpson, then referred him to Dr. Huddleston, a physical therapist.

8

Following those examinations, Dahlke informed Simpson he could
return to work on May 20, 1996. (*Id.* at 533-34, 552-53, 559.)

Simpson reported to work on May 20, 1996, but Lewis refused to
let him work without a doctor's excuse. (Simpson Deposition at
558, 561-62.) Simpson and Lewis met with Chrietzberg, who told
Simpson to return home. Simpson refused, and then was permitted to
work, but was restricted to performing only certain functions.
(*Id.* at 567-68, 572-73.)

In the ensuing months, Simpson contends he worked in jobs
which violated his restrictions seventy-five percent of the time.
(*Id.* at 598-600.) Simpson repeatedly was assigned to jobs which
caused him severe pain, despite numerous complaints to Lewis,
Shoemaker, Robertson, and Chrietzberg. (*Id.* at 569-71, 576-77,
579-82, 584-85.) On one occasion, Chrietzberg told Simpson that he
was being assigned to jobs that were "within [his] restrictions
even if it hurt [him], and that [those were] the only jobs that the
company wanted [him] to do." (*Id.* at 585.)

Simpson underwent additional treatment for his condition on
June 24, 1996. The procedure was performed by Dr. Hammer, who
released Simpson to return to work on July 1, 1996, provided that
he did not lift anything over twenty pounds and was not required to
sit or stand for long periods of time. (*Id.* at 602-03 and Exhibit
13.) Although Simpson reported to work on July 1, he was sent home
by Lewis. Later the same day, Dahlke contacted Simpson at home and

9

reported that he could return to work the next day. (*Id.* at 607, 610-11.)

Simpson worked without any extended leaves of absence from July 2, 1996 until April 1, 1997. During that period, he estimates that fifty percent of the jobs to which he was assigned violated his restrictions and caused excessive pain. (*Id.* at 601-02, 617-20, 624-28.) His complaints yielded no changes in his job assignments. When Simpson complained of having to walk too far in the course of performing his duties, he was asked: "where do your restrictions say it hurts you to walk?" (*Id.* at 639-40.) Supervisors and other management officials told Simpson his pain was not as severe as he claimed, and he was subjected to verbal harassment, including cursing and being called "little baby." (*Id.* at 218-19.)

In summary, Simpson alleges the following incidents of harassment occurred after he was afflicted with Complex Regional Pain Disorder Type 1[3] and began seeking accommodation:

1. Pennington refused to see him to discuss problems relating to his condition;

2. he received a written warning for missing work while undergoing a surgical procedure in April of 1996;

3. he was repeatedly told he was too slow and incapable of doing anything correctly;

4. he was pressured by various management officials to sign documents which he was not allowed to read, or else to get rid of his restrictions;

5. his efforts to return to work after surgery were thwarted because management officials refused to accept his return

---

[3] See note 1 *supra.*

10

to work authorization, demanded additional information, and refused to meet with him;

6. he was timed and continuously observed by supervisors while working;

7. he was assigned jobs outside his medical restrictions fifty percent of the time;

8. his complaints about performing work outside his restrictions were ignored or disregarded;

9. Chrietzberg asked him if he had AIDS;

10. he was called "cripple" and told he was a liability to the company;

11. managerial personnel told him he should volunteer for layoffs and file for disability;

12. company officials denied receiving copies of his medical restrictions and refused to meet with him to discuss his problem;

13. he was told to either perform the job assigned to him or go home;

14. he was sent home by his supervisors and then called to come back to work for "just a few minutes";

15. he was cursed, threatened and rebuked by his supervisors for notifying Chrietzberg that he had been assigned jobs which violated his restrictions;

16. he was refused access to documents containing the company's policy regarding disabled employees; and,

17. he was denied the opportunity to speak to anyone in the Human Resources Department during working hours.

Simpson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 21, 1996. Upon receiving notice of right to sue, he commenced this action on November 21, 1996, asserting violations of the Americans with Disabilities Act of 1990 against Cullman Products and its then-parent corporation, Superior Metal. Simpson filed an amended

11

complaint adding American Trim, L.L.C. as a defendant on January 22, 1997. Simpson thereafter filed a second charge with the EEOC on February 19, 1997, asserting he was retaliated against for filing the original charge.

The following motions are before the court:   defendants' motion for summary judgment; plaintiff's motion to compel; plaintiff's supplement to his motion to compel; plaintiff's notice of withdrawal of his motions to compel; plaintiff's motion to exclude witnesses and exhibits not properly identified; plaintiff's motion to strike defendants' objections to plaintiff's pretrial disclosures; defendants' motion to strike affidavit of Dr. Michael Hammer and for leave to file a reply memorandum; and plaintiff's motion to deny and strike defendants' motion to strike affidavit of Dr. Michael Hammer and for leave to file reply memorandum as untimely.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

12

106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if
the record taken as a whole could lead a rational trier of fact to
find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence
of a genuine issue as to any material fact. *Id.* In determining
whether this burden is met, the court must view the evidence "and
all factual inferences arising from it in the light most favorable
to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*,
398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to
the nonmovant to 'come forward with specific facts showing that
there is a genuine issue for trial.'" *Id.* (quoting *Matsushita
Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,
106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its
burden, "the nonmoving party may avail itself of all facts and
justifiable inferences in the record taken as a whole." *Tipton v.
Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citing
*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993,
994, 8 L.Ed.2d 176 (1962)).

"'The evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor.'" *Tipton*, 965
F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513).
Even so, a "mere 'scintilla' of evidence supporting the [nonmoving]
party's position will not suffice; there must be enough of a
showing that the jury could reasonably find for that party."

13

*Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson,* 477 U.S. at 242, 106 S.Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

### III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' motion asserts there is no genuine issue for trial as to seven material facts. Each is addressed in turn.

### A. Plaintiff's Claims Are Beyond the Scope of His EEOC Charge

Defendants contend plaintiff's claims in this action are limited by the terms of the EEOC charge he filed on February 21, 1996. That charge states:

> My name is Alton R. Simpson. I am a 49-year-old white male. I have been employed by Cullman Products Corporation as a machine operator since September 1971. Beginning on July 15, 1995, I had severe pain in my right foot. After numerous examinations by various doctors, I underwent a series of medical procedures to help alleviate the pain. I returned to work under doctor's restrictions on November 16, 1995. I requested a stool to sit on to do my job, since other machine operators were allowed to sit down. This request was denied and I was told to either stand up for 8 hours straight or else go home. The pain became so severe that on January 22, 1996, I passed out and had to be taken to the emergency room. I believe I have been discriminated against due to my disability.

(First Amended Complaint, Exhibit A.)    Defendants argue that plaintiff's claims in this action may only be based upon their alleged failure to provide him with a stool on an unspecified date between November 16, 1995 and January 22, 1996.    The court concludes that argument is specious.

14

It is well established that "the scope of the EEOC complaint
should not be strictly interpreted." *Sanchez v. Standard Brands,
Inc.*, 431 F.2d 455, 465 (5th Cir. 1971).[4]  Indeed, the former Fifth
Circuit instructs that

> procedural technicalities are not to stand in the way of
> Title VII complainants.  Nothing in the Act commands or
> even condones the application of archaic pleading
> concepts.  On the contrary, the Act was designed to
> protect the many who are unlettered and unschooled in the
> nuances of literary draftsmanship.  It would falsify the
> Act's hopes and ambitions to require verbal precision and
> finesse from those to be protected, for we know that
> these endowments are often not theirs to employ.

*Sanchez* at 565.  Although *Sanchez* was a Title VII case, courts
commonly extrapolate principles developed under Title VII for use
in ADA cases.  *See, e.g., Stewart v. Happy Herman's Cheshire
Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir. 1997)("assess[ing] ADA
retaliation claims under the same framework [employed] for
retaliation claims arising under Title VII").  Contrary to the
strict interpretation urged by defendants, the *Sanchez* court
emphasized that "the specific words of the charge of discrimination
need not presage with literary exactitude the judicial pleadings
which may follow." *Sanchez,* 431 F.2d at 465.  Thus, the court
adopted the following standard for determining whether a judicial
complaint exceeds the bounds of the underlying EEOC charge:

> [A] judicial complaint ... "may encompass any kind of
> discrimination like or related to allegations contained
> in the charge and growing out of such allegation during
> the pendency of the case before the Commission."  In
> other words, the "scope" of the judicial complaint is
> limited to the "scope" of the EEOC investigation which

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en
banc*), the Eleventh Circuit adopted as binding precedent all decisions of the
former Fifth Circuit handed down prior to October 1, 1981.

15

> can reasonably be expected to grow out of the charge of
> discrimination.

*Id.* at 466 (citation omitted).

Here, any variance between Simpson's EEOC filing and his
judicial complaint is inconsequential. Although the only specific
conduct about which Simpson complained in his EEOC charge related
to his request for a stool, his charge plainly was intended to
challenge conduct by his employer which violated his medical
restrictions. For example, Simpson also stated in his charge that
he was told: "either stand up for 8 hours straight or else go
home." That assertion, if true, arguably is a violation of his
medical restrictions, and investigation of that allegation could
reasonably be expected to encompass any violations of his medical
restrictions, including improper job assignments and refusal to
provide accommodations for his alleged disability.

Defendants also contend Simpson's EEOC charge encompasses only
conduct between November 16, 1995, and January 22, 1996, because
those are the only dates to which he makes reference. Yet, as
*Sanchez* makes clear, any "like or related" discriminatory acts
which arise "during the pendency of the case before the commission"
are within the scope of the EEOC charge. *Sanchez*, 431 F.2d at 466.
Thus, Simpson is not limited to acts which occurred before January
22, 1996. Rather, his complaint and amended complaint properly
include all "like or related" acts which occurred during the
pendency of his EEOC investigation. That investigation ended on
August 26, 1996, upon issuance of a right to sue letter. (*See*

16

Plaintiff's Complaint, Exhibit B; *see also* 29 C.F.R. § 1608.28 ("Issuance of a right to sue shall terminate further proceedings of any charge").) This court concludes that Simpson's EEOC charge encompasses claims for failure to accommodate arising from acts which occurred between the dates of November 16, 1995, and August 27, 1996.

Simpson also asserts that, beginning with his return to work in November of 1995, and increasingly after February 21, 1996, he was subjected to ongoing verbal harassment and abuse in retaliation for complaining about violations of his medical restrictions. That claim was not asserted in his EEOC charge, because it grew, in part, from the filing of the charge itself. The Eleventh Circuit has recognized that "a claim of retaliation could reasonably be expected to grow out of the original charge of discrimination." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). Thus, no separate EEOC filing for Simpson's claim for retaliatory harassment was necessary. Nevertheless, the court notes that Simpson filed a second charge with the EEOC on January 19, 1997, in which he asserted such a claim. (Dahlke Affidavit, Exhibit A.) Simpson did not sue based upon that charge. He would have been permitted to assert a claim of retaliation arising out of his original charge even without the second charge, however, based upon retaliatory acts which occurred after the date of the original charge. *See Baker*, 856 F.2d at 169.

Accordingly, upon application of the guiding principles set out in *Sanchez* and a thorough review of Simpson's original and

17

amended complaint, this court concludes that the claims asserted
therein do not exceed the scope of Simpson's original EEOC charge,
and summary judgment on that basis is not warranted.

**B.  No Claims May Be Maintained Against American Trim**

Defendants assert that American Trim, L.L.C. ("American Trim")
cannot be liable to Simpson for any discrimination because it was
not named in his EEOC charge.

"Ordinarily, a party not named in the EEOC charge cannot be
sued in a subsequent civil action."  *Virgo v. Riviera Beach
Associates*, 30 F.3d 1350, 1358 (11th Cir. 1994).  "However, courts
liberally construe this requirement."  *Virgo*, 30 F.3d at 1358.  The
following factors are relevant to an inquiry into whether an
unnamed party is properly sued in a subsequent action:

>    (1) the similarity of interest between the named party
>    and the unnamed party;
>
>    (2) whether the plaintiff could have ascertained the
>    identity of the unnamed party at the time the EEOC charge
>    was filed;
>
>    (3) whether the unnamed parties received adequate notice
>    of the charges;
>
>    (4) whether the unnamed parties had an adequate
>    opportunity to participate in the reconciliation process;
>    and,
>
>    (5) whether the unnamed party actually was prejudiced by
>    its exclusion from the EEOC proceedings.

*Id.* at 1359.  Cullman Products Corporation and its then-parent
corporation, Superior Metal Products, Inc., were both named in
Simpson's February 21, 1996, EEOC charge, but American Trim was
not.    (First Amended Complaint, Exhibit A.)    American Trim

18

purchased the assets of Cullman Products from Superior Metal on January 22, 1996, and assumed ownership and control of Cullman Products on that date. (Defendants' Motion for Summary Judgment at 3; Plaintiff's Exhibit C.)  The company has continued to operate its metal fabrication facility in the same Cullman location since that asset transfer, with essentially the same employees and the same management. (Plaintiff's Exhibit C.)  George Pennington, vice president of operations for Cullman Products before the asset purchase, remained in that position after the asset purchase. (Pennington Deposition at 6-7, 136-38.)  Pennington admittedly was involved in preparing a response to Simpson's EEOC charge after the asset transfer.  (*Id.* at 138-39.)  Pennington further testified that Ed Kasody, president of American Trim, has been his immediate supervisor since November of 1991.  (*Id.* at 7.)

American Trim thus was on notice of the charge, because American Trim is the sole owner of Cullman Products, and because Simpson properly identified both the name under which American Trim was operating, Cullman Products, and its correct address.  *See Virgo*, 30 F.3d at 1359 (successor corporation on notice because EEOC charge identified name under which it transacted business). Most significantly, American Trim's vice president of operations, George Pennington, helped compile a response to Simpson's EEOC charge, thus affording the company an adequate, if ultimately unsatisfactory, opportunity at conciliation. Given American Trim's knowledge of the EEOC charge from such an early date, no prejudice can result from its inclusion in this lawsuit.

19

Based upon a review of the relevant factors cited above and the extensive record in this action, the court concludes American Trim's interest in this litigation is virtually identical to Cullman Products' interest. Further, the court finds that American Trim received adequate notice of the charge through its vice president of operations, George Pennington, and had an adequate opportunity to participate in the EEOC conciliation process. No prejudice resulted from American Trim's omission from Simpson's EEOC charge. Accordingly, defendants are not entitled to summary judgment on that ground.

## C.   Plaintiff Allegedly Has No Disability

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate:  (1) that he has a disability; (2) that he is a "qualified individual" (*i.e.*, that he can perform the essential functions of the job position he holds or seeks, with or without reasonable accommodation being made by the employer); and, (3) that he was discriminated against because of his disability. *See* 42 U.S.C. § 12132; *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996).   Defendants challenge only Simpson's proof that he has a disability.

To establish a disability under the ADA, a plaintiff must show that he suffers from "a physical or mental impairment that substantially limits one or more of [his] major life activities ...."   42 U.S.C. § 12102(2)(A); *accord Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

20

Defendants do not dispute that Simpson has a physical impairment. Instead, they argue that Simpson's impairment does not "substantially limit[] one or more ... major life activities." Thus, the court will focus its analysis on those terms. According to one leading treatise,

> The definitions of "major life activity" and "substantial limitation" are closely allied. "Major life activities" are the basic activities that average persons can perform with little or no difficulty, "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." "Substantially limits" means either the total inability or a severe restriction on the ability to perform a major life activity (in terms of condition, manner, or duration) as compared to the general population. The determination of whether an individual is "disabled" [therefore] depends on the effect the impairment has on the particular individual's life, and not simply on the name or diagnosis of the impairment. [Quoting 29 C.F.R. §§ 1630.2(i), 1630.2(j)(1).]

I B. Lindemann & P. Grossman, Employment Discrimination Law 276 (3d ed. 1996). That interpretation is borne out in the pertinent EEOC regulations which define the terms used in the Act.[5] For example, 29 C.F.R. § 1630.2(i) provides that:

> (i) Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

---

[5] Those regulations are not binding on this court. Nevertheless, "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ... for guidance" when interpreting the ADA. Gordon v. E.L. Hamm & Associates, Inc., 100 F.3d 907, 911 (11th Cir. 1996). Moreover, the Supreme Court has long recognized that an agency's interpretation of a statute it is charged with enforcing should be given "considerable weight," and should not be disturbed unless it appears from the statute or legislative history that Congress intended a different construction. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); see also Griggs v. Duke Power Co., 401 U.S. 424, 433, 434, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971)(administrative interpretations "entitled to great deference"). The Chevron standard is applied by the Eleventh Circuit in the context of ADA claims. Harris v. H & W Contracting Co., 102 F.3d 516, 521 (11th Cir. 1996).

21

Further, the Interpretative Guidance attached as an Appendix to

that section elaborates as follows:

### Section 1630.2(i)  Major Life Activities

This term adopts the definition of the term "major
life activities" found in the regulations implementing
section 504 of the Rehabilitation Act at 34 CFR part 104.
"Major life activities" are those basic activities that
the average person in the general population can perform
with little or no difficulty.   Major life activities
include caring for oneself, performing manual tasks,
walking, seeing, hearing, speaking, breathing, learning,
and working.  This list is not exhaustive.  For example,
other major life activities include, but are not limited
to, sitting, standing, lifting, reaching.  ...

29  C.F.R.  Pt.  1630,  App.  §  1630.2(i),  at  402  (citations

omitted)(emphasis supplied).  Simpson contends he is substantially

limited in his ability to walk, sit, stand, lift, and work.

(Plaintiff's Brief at 44.)   The regulations deem each of those

activities to be major life activities.

The more difficult question is whether plaintiff's impairment

"substantially limits" one or more of those enumerated activities.

That phrase is not defined by the ADA, but implementing regulations

instruct that it means the plaintiff either is:

(i) Unable to perform a major life activity that the
average person in the general population can perform; or

(ii) Significantly restricted as to the condition,
manner, or duration under which an individual can perform
a particular major life activity as compared to the
condition, manner, or duration under which the average
person in the general population can perform that same
major life activity.

29  C.F.R.  §  1630.2(j)(1).   The EEOC further instructs that the

following factors should be considered in determining whether a

particular individual is substantially limited:

22

         (i) The nature and severity of the impairment;

         (ii) The duration or expected duration of the impairment; and

         (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). Thus, the relevant inquiry is whether plaintiff, as compared to the average person in the general population, is "significantly restricted as to the condition, manner, or duration" under which he can perform a particular major life activity. 29 C.F.R. § 1630.2(j).

As defendants point out, several circuits outside the Eleventh have considered the question whether a lifting restriction constitutes a substantial limitation on a major life activity. The courts considering this question have generally held that such a restriction does not constitute a disability as defined by the ADA and its regulatory gloss.

The Fourth Circuit, for example, considered the issue in *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346 (4th Cir. 1996). There, plaintiff was assigned a twenty-five pound lifting restriction. The Fourth Circuit concluded as a matter of law that such a restriction did not constitute a substantial limitation on a person's ability to lift, work, or perform any other major life activity. *Id.* at 349; *see also Ray v. Glidden Co.*, 85 F.3d 227 (5th Cir. 1996)(holding that a five to ten pound lifting restriction established only an inability to perform the "discrete task" of lifting, and that such handicap did not render

23

plaintiff substantially limited in a major life activity); *Aucutt v. Six Flags Over Mid-American, Inc.*, 85 F.3d 1311 (8th Cir. 1996)(holding that a twenty-five pound restriction did not constitute a disability); *Thompson v. Holy Family Hospital*, 121 F.3d 537 (9th Cir. 1997)(holding that plaintiff who was restricted from lifting more than 25 pounds on a continuous basis, more than 50 pounds twice a day, and more than 100 pounds once a day was not substantially limited). *But see Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir. 1996)(holding, based in part on the EEOC regulations, that lifting is a major life activity and that inability to lift more than 15 pounds creates genuine issue of material fact as to whether impairment substantially limits the ability to lift); *Cordle v. Tropicana Products, Inc.*, 1997 WL 118433, No. 94-1835-CIV-T-17A (M.D. Fla. Feb. 20, 1997)(citing the regulations as supporting plaintiff's claim that a lifting restriction limited the major life activity of performing manual tasks); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1100 (S.D. Ga. 1995)(citing the EEOC regulations).

Here, however, the court assigns particular significance to the fact that Simpson's work restriction encompasses more than only a lifting limitation. In addition to restricting the weight that Simpson should attempt to lift, Dr. Hammer instructed that he also was to avoid prolonged sitting and standing. (Simpson Deposition at 401; Simpson Volume Five at 41.) Moreover, Dr. Beeler's company-ordered examination resulted in a recommendation that

24

Simpson should not stand or walk for long periods, or climb at all. (Simpson Deposition at 420; Dahlke Deposition, Plaintiff's Exhibit 3.)   In contrast, none of the plaintiffs in the cases cited above, or in the additional cases cited by defendants, were subject to such broad, combined restrictions on climbing, sitting, standing, and walking.   Thus, although those decisions are persuasive, the court concludes they are not dispositive of this case.

Additionally, Simpson has produced substantial evidence that his impairment is chronic, severe, and substantially limits his ability to work.   For example, Dr. Hammer testified in affidavit that "Mr. Simpson cannot do any jobs that require prolonged sitting, standing, or walking, or that do not allow him to move around at will.   Mr. Simpson cannot do jobs that do not allow him to elevate his foot when necessary."   (Hammer Affidavit ¶ 5.)   That determination comports with the November 17, 1995 recommendation of Dr. Beeler, the company physician, who instructed that Simpson had a "[m]edical defect which render[ed him] unfit for certain types of jobs."   (Dahlke Deposition, Plaintiff's Exhibit 3 (emphasis supplied).)   Dr. Beeler further recommended that Simpson "should not climb ladders, ... [should engage in] no prolonged walking ... [and] no carrying [of] weight over 20-25 [pounds]."   (Id.)   Simpson testified that those impairments restrict his ability to perform certain jobs at Cullman Products.   He also testified that he has sought other employment since his condition was diagnosed, but has received no job offers.   (Simpson Deposition at 184-88.)   Dr. Hammer testified that "[t]he distance and duration [Simpson] is

25

able to walk are significantly shorter than the average person is able to walk. Likewise, Mr. Simpson is able to lift substantially less than the average person, and sit and stand for much shorter periods of time." (Hammer Affidavit ¶ 4.) In light of that evidence, the appendix to the EEOC regulations offers an instructive example:

> [A]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform jobs in another class. This would be so even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs.

29 C.F.R. Pt. 1630, App. § 1630.2(j) at 403.

Thus, Simpson has produced sufficient evidence to create a genuine dispute for trial as to whether his admitted physical impairment substantially limits his ability to engage in one or more major life activities, including the activity of working. Accordingly, defendants are not entitled to summary judgment on that basis.[6]

## D. Plaintiff Has Suffered No Adverse Employment Action

Defendants contend that none of the actions about which Simpson complains constitute adverse employment actions. The Eleventh Circuit has not clearly defined what constitutes an "adverse employment action" under the ADA. Defendants urge application of the standard adopted by the Fifth Circuit in *Mattern*

---

[6] Because the court has determined that Simpson has raised a genuine issue for trial regarding whether he has a disability, it need not consider whether he also might meet the alternative definitions of disability set forth in the Act. *See* 42 U.S.C. § 12102(2)(B) and § 12102(2)(C).

26

*v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1996), in the

context of a Title VII retaliation claim, wherein that court held

that an adverse employment action must be an "ultimate employment

action" such as discharge, or failure to hire or promote. In a

similar case recently decided by the Eleventh Circuit, however, the

court explicitly rejected *Mattern*:

> We join the majority of circuits which have addressed the
> issue and hold that Title VII's protection against
> retaliatory discrimination extends to adverse actions
> which fall short of ultimate employment decisions.  ...
> [That] interpretation ... is consistent with Title VII's
> remedial purpose. Permitting employers to discriminate
> against an employee who files a charge of discrimination
> so long as the retaliatory discrimination does not
> constitute an ultimate employment action, could stifle
> employees' willingness to file charges of discrimination.

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.

1998)(emphasis supplied). Accordingly, the Eleventh Circuit

directed that reliance on the plain language of the statute is

appropriate. The statute pertinent to this case reads:

> No covered entity shall discriminate against a qualified
> individual with a disability because of the disability of
> such individual in regard to job application procedures,
> the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Here, Simpson has presented evidence that his supervisors and

management officials have subjected him to harassment which affects

the terms and conditions of his employment. (*See, e.g.,* Simpson

Deposition at 413-15, 417-18, 433, 435, 438, 444-46, 453, 459, 483-

84, 649, 692; Simpson Volume Five at 42-43, 86, 88.) Moreover,

Simpson testified that he received his worst performance evaluation

27

in 25 years of employment with Cullman Products just eight months after he filed his EEOC charge, and two months after commencing this action. (Simpson Deposition at 269-70; Dahlke Deposition, Exhibit 2.) He also asserts he has received written reprimands for missing work due to his condition, and verbal reprimands and ridicule for complaining about work assignments which violate his restrictions. (*Id.* at 268, 281-82.)

Simpson's testimony regarding such harassment supports both his claims for disability discrimination and for retaliation. Such evidence, taken together and considered in a light most favorable to Simpson, is sufficient to create a triable issue regarding whether he was subjected to an adverse employment action. *See, e.g., Wideman,* 141 F.3d at 1456 (holding that the following acts, "considered collectively are sufficient to constitute prohibited discrimination": listing plaintiff as absent on a day she was scheduled to have off, requiring plaintiff to work without a lunch break, giving plaintiff her first written reprimands in 11 months of employment within one month of her EEOC charge, soliciting negative comments from plaintiff's co-workers, and needlessly delaying medical treatment for plaintiff's allergic reaction); *Kim v. Nash Finch Co.,* 1997 WL 471351 (8th Cir. 1997)(holding that a reduction in duties, lower performance evaluations, remedial training, and the "papering" of plaintiff's employment file with written reprimands constituted actionable adverse employment actions).

28

**E.    Defendants Have Provided Reasonable Accommodation to Plaintiff**

Defendants argue that they have reasonably accommodated Simpson's disability by assigning him only to jobs within his restrictions.  The evidence presented by Simpson, however, belies that contention.

Simpson testified that he requested a stool on which he could sit while operating machinery, but his request was denied.  He contends he was provided a three-wheeled vehicle to ease his movement about the facility, but several days later the vehicle was taken away without explanation.  He contends he requested to be assigned only to jobs which were within his medical restrictions, but was repeatedly given assignments which violated those restrictions; and, when he complained, he was told to "do his job or go home."  (Simpson Volume Five at 44; *see also, e.g.,* Simpson Deposition at 154-66; Simpson Volume Five at 42-43.)    That testimony establishes genuine issues of material fact which are appropriately resolved by a jury, not this court.

Defendants further contend that Simpson was responsible for the breakdown in the conciliation process, because he refused to attend scheduled meetings, and, failed to respond to requests for information.   (Defendants Motion for Summary Judment at 26-27.) Yet, Simpson testified that, on several occasions, Evelyn Dahlke and other management personnel failed to appear for scheduled appointments with him, or otherwise made themselves unavailable to discuss his return to work.  (Simpson Volume Five at 140-42, 150-54, 157-61.) ˙ Those disputes present genuine issues for trial.

29

## F.    Plaintiff Cannot Prove Actionable Harassment

Defendants contend the ADA does not provide a cause of action for harassment based upon an employee's harassment. The same argument once was made to bar sexual harassment claims under Title VII. In extending Title VII's protections to sexual harassment claims, however, the Supreme Court cited the following language from the Eleventh Circuit:

Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Meritor*, 477 U.S. at 66-67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)). Such an argument has inherent appeal in the context of the ADA, given the broad protections afforded to disabled individuals under the Act.

Moreover, although the Eleventh Circuit has not yet recognized such a claim, two courts within (and several outside) this circuit have done so. *See, e.g., Rio v. Runyon*, 972 F. Supp. 1446 (S.D. Fla. 1997); *McClain v. Southwest Steel Co.*, 940 F. Supp. 295, 301-302 (N.D. Okla. 1996); *Gray v. Ameritech Corp.*, 937 F. Supp. 762, 771 (N.D. Ill. 1996); *Fritz v. Mascotech Automotive Systems Group*, 914 F. Supp. 1481, 1492 (E.D. Mich. 1996); *Henry v. Guest Services, Inc.*, 902 F. Supp. 245, 251-252 (D. D.C. 1995), *aff'd* 98 F.3d 646 (D.C. Cir. 1996); *Haysman v. Food Lion, Inc.*, 893 F. Supp.

1092 (S.D. Ga. 1995). In *Rio,* the United States District Court for the Southern District of Florida said:

> Disability-based hostile environment claims are analyzed under the Title VII standards for gender-based hostile environment claims. ... To establish a hostile environment claim based on disability, an employee must prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based upon her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Rio,* 972 F. Supp. at 1459 (citations omitted).

Assuming the existence of such a claim, and applying *Meritor,* Simpson must show that his workplace was permeated with harassment that was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)(internal quotation marks omitted)(citation omitted). Defendants contend Simpson cannot demonstrate harassment which rises to that level. This court disagrees.

The Supreme Court instructs that proper analysis of a hostile environment claim demands consideration of "all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems,*

31

*Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 295 (1993).

Simpson has recited various incidents of verbal abuse by his supervisors, including use of epithets such as "cripple" and "little baby." He also contends he was cursed for complaining to management, watched closely, timed while he worked, and that management officials repeatedly thwarted his attempts to return to work after medical leave and pressured him to "get rid of" his restrictions. A jury could find such treatment, taken as a whole, constitutes severe and pervasive conduct which altered a term or condition of Simpson's employment with Cullman Products.[7]

## G.  Plaintiff Is Not Entitled to Compensatory or Punitive Damages

Defendants contend Simpson is not entitled to recover compensatory or punitive damages, because the company made a good faith effort to accommodate his asserted disability. *See* 42 U.S.C. § 1981a(a)(3)("damages may not be awarded... where the [employer] demonstrates good faith efforts, in consultation with the person with the disability ..., to identify and make a reasonable accommodation...."). However, Simpson has produced substantial evidence that the company repeatedly refused to accommodate his restrictions by assigning him to jobs which violated those restrictions. (*See, e.g.,* Simpson Deposition at 601-02, 617-20, 624-28.) Such evidence creates a genuine issue for trial as to defendants' good faith.

---

[7] See discussion *supra* pp. 26-28.

32

Defendants also argue that punitive damages are not available to Simpson because he cannot show that the company "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *See* 42 U.S.C. § 1977A(b)(1). Malice means "an intent to harm," and recklessness means "serious disregard for the consequences of [one's] actions." *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 491 (11th Cir. 1996). Simpson has presented evidence that several members of Cullman Products' management, including Dahlke and Sims, engaged in a concerted effort to avoid abiding by his medical restrictions, and to pressure him to either quit or "get rid of" the restrictions. That evidence, if believed by a jury, could warrant an award of punitive damages. *See, e.g., Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1422 (M.D. Ala. 1996)(holding that supervisors' "mocking" and "riding" of plaintiff, and intentional derogatory remarks about his hearing disability were sufficient evidence of malice to avoid summary judgment on the issue of punitive damages).

Finally, defendants contend that Simpson is not entitled to recover for physical injury and pain, because he "cannot attribute any portion of [his] condition to work-related injuries." (Defendants' Brief in Support of Summary Judgment at 32.) Defendants cite no authority for such an argument, and it is rejected.

For the foregoing reasons, defendants' motion for summary judgment is due to be denied.

33

## IV.   OTHER PENDING MOTIONS

Seven other motions also are pending before the court in this action.

### A.   Plaintiff's Motion to Compel Supplement to Motion to Compel Notice of Withdrawal of Motions to Compel

Plaintiff moved to compel discovery on November 12, 1997. (Doc. No. 55.) Plaintiff filed a supplement to that motion on the same date. (Doc. No. 58.) Six days later, plaintiff filed a "notice" of withdrawal of those motions. (Doc. No. 64.) That document was correctly identified as a pending motion, and remains so identified to this date. In any event, the disputes raised in plaintiff's motions have been resolved. Accordingly, plaintiff's motion to compel and supplement to his motion to compel are hereby deemed moot, and the "notice" of withdrawal (construed as a motion for permission to withdraw) those motions is due to be granted.

### B.   Plaintiff's Motion to Exclude Witnesses and Exhibits Not Properly Identified

Plaintiff moves to exclude numerous witnesses and exhibits identified in defendants' disclosure of trial witnesses and exhibits, because they were not previously identified and disclosed pursuant to Federal Rule of Civil Procedure 26. Defendants have filed no response to plaintiff's motion.

Application of the sanction of exclusion is governed by Rule 37(c)(1), which provides, in pertinent part, that: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure

34

is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Exclusion under Rule 37(c)(1) is "automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless." *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996). The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court. *Id.* at 1231.

Defendants have had a full opportunity to respond to the motion, yet have inexplicably ignored their burden of demonstrating that their failure to disclose was either justified or harmless. Having failed in that burden, exclusion is automatic. The following witnesses therefore are excluded from testifying for the defendants: primary witnesses numbered (4), (9), and (14); secondary witnesses numbered (1)-(12), and (14)-(15).[8] The following exhibits also are excluded for the same reason: exhibits numbered (1)-(4), (7)-(10), (14)-(15), and (20)-(21).

Plaintiff also moves, for the third time, to exclude the testimony of Patsy Bramlett and her report. The court has addressed the issue of Ms. Bramlett's testimony on two prior occasions. By order entered December 24, 1997, the court declined to exclude her testimony. (*See* Doc. No. 76.) Plaintiff has

---

[8] Those witnesses are fully identified in defendants' disclosure of trial witnesses and exhibits filed on January 20, 1998. (*See* Doc. No. 79.)

articulated no reason this court should alter its prior decision. Accordingly, Ms. Bramlett will be permitted to testify.

## C.  Plaintiff's Motion to Strike Defendants' Objections to Plaintiff's Pretrial Disclosures

Plaintiff moves to strike defendants' objections to plaintiff's pretrial disclosures as untimely. Plaintiff's pretrial disclosures were due under this court's scheduling order on January 19, 1998. Defendants' objections to those disclosures were due within 14 days of that date. Defendants filed their objections on February 3, 1998, 15 days after January 19, 1998. January 19, however, was a federal holiday, the birthday of Dr. Martin Luther King, Jr. Federal Rule of Civil Procedure 6(a) provides that deadlines which fall upon a federal holiday or weekend are extended to the next day. Thus, the deadline for plaintiff's disclosures was January 20, and defendants' objections filed on February 3 were timely. The motion is due to be denied.

## D.  Defendants' Motion to Strike Affidavit of Michael Hammer, M.D., and for Leave to File Reply Memorandum

Defendants contend Dr. Michael Hammer's affidavit is a sham, and should be stricken from the record. The Eleventh Circuit holds that "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.* 736 F.2d 656 (11th Cir. 1984). However, if the

36

affidavit is not inherently inconsistent with the earlier testimony, the affidavit will not be considered a sham. *Id.* (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887 (5th Cir. 1980)).

Defendants contend Dr. Hammer's affidavit testimony in paragraphs 3-5 contradicts the restrictions he previously imposed upon Simpson, and about which he testified during deposition. Yet, the deposition testimony to which defendants' direct the court reveals questions which were far from "unambiguous":

> Q.   Okay.   That's a release with — showing <u>some</u>
>      <u>limitations</u> on what Mr. Simpson could do?
>
> A.   Yes.

(Hammer Deposition at 113.) Dr. Hammer then proceeded to respond to questions about his notations on a return to work authorization form which he completed on March 11, 1997 at the company's request. (*Id.* at 114-16.) Upon a thorough review, the court concludes Dr. Hammer's affidavit does not "inherently contradict" his prior deposition testimony. On deposition, Dr. Hammer responded to precise questions about his notations on a form. In affidavit, Dr. Hammer elaborated on Mr. Simpson's condition and its impact on his ability to perform various tasks. Such elaboration simply cannot be conveyed in the confines of a return to work authorization form. Indeed, Dr. Hammer plainly testified that the form merely showed "<u>some</u> limitations on what Mr. Simpson could do"; he does not say, and he was not asked by defendants' counsel, whether the form listed <u>all</u> such limitations. (*Id.* at 113-16.)

37

Moreover, Dr. Hammer's affidavit testimony is not limited to a precise point in time. It is undisputed that Simpson's restrictions have varied over time. Thus, without linking Dr. Hammer's affidavit testimony to a particular date, it cannot be said to be inherently inconsistent with a form designed to identify Simpson's medical restrictions on March 11, 1997. Accordingly, defendants' motion to strike the affidavit of Dr. Hammer is due to be denied.

Additionally, defendants identify no reason this court should consider their reply memorandum in support of their motion for summary judgment. A cursory review of the brief indicates it is nothing more than redundant arguments and attempted clarification of the same points made in defendants' original brief. Defendants present no previously unknown evidence or legal authority to support their motion. Absent some evidence that the arguments contained therein could not have been made in their original brief, this court is not inclined to grant defendants a second opportunity to argue their motion. Defendants' motion for leave to file a reply memorandum therefore is due to be denied, and the reply brief struck from the record.

**E.    Plaintiff's Motion to Deny and Strike Defendants' Motion to Strike Affidavit of Michael Hammer, M.D., and For Leave to File Reply Memorandum as Untimely**

Although deemed a motion, this filing is more properly styled a response or opposition to defendants' motion. Given the court's determination that defendants' motion is due to be denied, plaintiff's motion is deemed moot.

38

## V.  CONCLUSION

For the foregoing reasons, the court concludes the following motions are due to be denied:  defendants' motion for summary judgment; plaintiff's motion to strike defendants' objections as untimely; and, defendants' motion to strike the affidavit of Dr. Michael Hammer.    The  following  motions  are  deemed  moot: plaintiff's motion to compel; plaintiff's supplement to his motion to compel; and, plaintiff's motion to deny and strike defendants' motion.  Plaintiff's motion to exclude witnesses and exhibits is due to be granted.  Finally, plaintiff's notice of withdrawal of his motions to compel, construed as a motion for permission to withdrawn those motions, also is due to be granted.

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this  12th day of August, 1998.

_____
United States District Judge

39